**MOTOR HAULAGE CO., Inc., v. UNITED STATES et al.**

Civ. No. 7097.

District Court, E. D. New York.

Jan. 20, 1947.

Judgment Affirmed April 28, 1947.

See 67 S.Ct. 1205.

Lord, Day & Lord, of New York City (Parker McCollester, P. G. Martin and Frank J. Clark, all of New York City, on the brief), for plaintiff.

Edward Dumbauld, Sp. Asst. to the Atty. Gen., for the United States of America.

J. Stanley Payne, Asst. Chief Counsel, of Washington, D. C., Interstate Commerce Commission (Daniel W. Knowlton, Chief Counsel, of Washington, D. C., Interstate Commerce Commission, on the brief), for defendant Interstate Commerce Commission.

H. Lauren Lewis and Robert J. McBride, both of Washington, D. C., for Regular Common Carrier Conference of the American Trucking Associations, Inc.

Before CLARK, Circuit Judge, and BYERS and KENNEDY, District Judges.

KENNEDY, District Judge.

I. This is a suit to enjoin, set aside, annul, and suspend an order of the Interstate Commerce Commission, 28 U.S.C.A. §§ 41, 43–48. Plaintiff, prior to August 9, 1935, the date of the enactment of the Interstate Commerce Act, part II, dealing with motor carriers, 49 U.S.C.A. §§ 301–327, was engaged in certain operations with motor vehicles, which will be dealt with in detail later.

On February 4, 1936, plaintiff filed its application with the commission claiming rights under the "grandfather clause" of the act, Interstate Commerce Act, part II, sec. 209(a), 49 U.S.C.A. § 309(a). Preliminary proceedings were had and formal hearings held before an examiner on October 27, 1938 and between November 10, and November 16, 1938. The examiner proposed a report dated July 12, 1939 to which plaintiff filed exceptions on July 31, 1939. On April 11, 1944 a report and order were filed by Division 5 of the commission, whereupon plaintiff filed a petition asking that the matter be reconsidered by the entire commission (43 M.C.C. 802). As a result of the last proceeding the order of Division 5 was set aside and on January 7, 1946 the commission filed its decision and made and entered the report and order which plaintiff now seeks to set aside (46 M.C.C. 107). On March 9, 1946 plaintiff petitioned the commission for amendment and modification of its second report, but the commission denied the application. The complaint in this action was filed on June 15, 1946.

II. Plaintiff was organized under the laws of the State of New York in 1916 and ever since has been continuously engaged in motor carrier operations both in intrastate and interstate commerce. With certain exceptions, not important for this outline, plaintiff's business was conducted within a radius of 50 or 60 miles from Columbus Circle, New York. Its headquarters are in Brooklyn, New York.

Plaintiff owned, at the time of the hearings before the commission, 8 types of motor trucks and semi-trailers which it describes as follows: (1) station wagons, rack platform, and van body trucks, and semi-trailers for general merchandise, (2) van body trucks equipped with armored cabs and alarms for handling valuables, (3) insulated van bodies for handling fresh meats, (4) insulated and heated bodies for handling wines and liquors in the winter time, (5) winch trucks for handling large and bulky pieces, (6) bodies equipped with special racks and scaffolding for handling metal car signs, (7) small delivery trucks for handling express shipments, (8) reach semi-trailers 48 feet long for handling airplanes.

Both the commission and the plaintiff took the view that the latter's business could be divided into 5 categories, described in the plaintiff's brief thus:

(1) Contracts of rental without responsibility. Here plaintiff leases trucks and equipment on a mileage basis or at agreed amounts per day, week or month. Plaintiff says that it does not undertake to transport the cargo under these contracts. It agrees to maintain the trucks in good order and repair, to carry personal injury and property damage insurance and to garage and fuel the trucks. When it supplies drivers, it pays their wages, compensation insurance, and social security taxes. For these amounts plaintiff bills the "lessee" at cost plus a handling charge.

(2) Contracts of rental with responsibility. Under this type of arrangement, differing from the above only in the matter of carrier's responsibility, plaintiff is liable for damages if the cargo is lost or injured. Compensation is on a mileage or time basis per truck.

(3) Tonnage contracts. All parties agree that these are transportation contracts. Compensation is computed on a weight measurement or other unit basis in the same way as under contracts of rental with responsibility. Plaintiff, under its tonnage contracts, undertakes to provide services which will meet the peculiar transportation needs of the customer.

(4) Special service contracts. These contracts really cover very peculiar trucking operations and services such as the hauling of new airplanes, the picking up of crashed planes, the distribution of telephone directories, and the transportation

of large illuminated car signs and equipment specially designed for the purpose.

(5) *Miscellaneous trucking contracts.* Under these contracts the plaintiff handles shipments in and around the New York metropolitan area under individual agreements, the arrangement usually being made by telephone and later confirmed in writing. Only about 5% of plaintiff's total business was in this category, and of that 5% unquestionably a very large amount was within the "New York Commercial Zone".[1]

III. We now turn to the order of the commission, which plaintiff attacks. Authority was granted to the plaintiff to transport over irregular routes: (1) general commodities, with certain exceptions, and subject to certain limitations which must be noticed in greater detail at a later point; (2) malt beverages to certain points in New Jersey and in Connecticut; (3) telephone directories between New Jersey and points in Long Island, Rockland and Westchester Counties and Fairfield, Connecticut; (4) illuminated car signs from New York to Berwick, Pennsylvania; (5) damaged air-planes from points in 13 states and the District of Columbia within 250 miles of Columbus Circle, New York, New York, to points in Long Island and New York.

Plaintiff's quarrel with the action of the commission concerns itself principally with the first division named above, although a point is made about the portion of the order which deals with malt beverages. Plaintiff also complains about other specific findings of the commission to be mentioned later. For present purposes, it is, however, sufficient to point to the fact that the last 4 paragraphs of the commission's order concern themselves with specific commodities, which plaintiff had been transporting prior to the effective date of the grandfather provision and we read this order to mean that plaintiff may carry these specific commodities without limitation other than the stated geographical limitations. But in the operation of the order dealing with the carriage of "general commodities" the commission imposes not only geographical limitations but also restrictions concerning the character of the commodities and the conduct of the operation itself.

IV A. The order permits the plaintiff to carry general commodities, except live stock, commodities in bulk, dangerous explosives, and household goods. These exceptions were derived from one of the commission's own precedents (Practices of Motor Common Carriers of Household Goods, 17 M.C.C. 467). Plaintiff urges that the commission erred in applying to it restrictions which had been found appropriate for other contract carriers, because under its system of operation it merely rents the truck and is not concerned with how the "lessee" uses it. It says that under its practice, certainly in contracts "without responsibility", it does not and did not know anything about the contents of the trucks, and that the exception arbitrarily limits the scope of its operations as they were conducted on the grandfather date.

IV B. The order, dealing with general commodities, provides further that general commodities shall be transported by plaintiff only between points in the New York Commercial Zone and those in New Jersey within 10 miles of Jersey City, New Jersey, or to points in Connecticut, New Jersey and New York within 40 miles of Columbus Circle. Concerning this, plaintiff contends that the 40-mile limit is too small; that on the grandfather date it was performing transportation services well beyond the area

[1] This zone was defined in New York Commercial Zone, 1 M.C.C. 665. The commission's order was sustained by a statutory court in Charles Noeding Trucking Co. v. United States, D.C., 29 F.Supp. 537. The statutory basis for such zoning is to be found in the Motor Carriers Act, sec. 203(b) (8) and was discussed in United States v. Capital Transit Co., 325 U.S. 357–360, 65 S.Ct. 1176, 89 L.Ed. 1663. Substantially, when the commission under the authority of that statute has defined a certain area, intrastate transportation within that zone is not subject to the Interstate Commerce Act and interstate transportation, unless conducted under a common control management or arrangement for continuous carriage or shipment to or from a point beyond the zone is exempt from the provisions of the Motor Carriers Act, except those relating in general to safety of operation.

20

in which its operations would now be limited by the commission's order.

IV C. ■ We think that the issues may be made clearer if we deal at this point with plaintiff's complaint about the restrictions placed by the commission upon the transporting of general commodities so far as they relate (1) to the character of the commodities and (2) the geographical area of transportation. We believe that by the commission's order plaintiff received the "substantial parity" required by the precedents. Alton Railroad Co. et al. v. United States, 1942, 315 U.S. 15, 22, 62 S.Ct. 432, 86 L.Ed. 586. It seems to us that plaintiff's argument for wider grandfather rights in these particulars is based not so much upon what it actually did prior to the critical date as upon what it might have done. It might, for example, have transported household goods under its contracts, or it might have covered an area greater than that set by the commission. But we do not believe that the grandfather clause is to be interpreted in any such manner. We think the statute means that the commission should take into consideration only actual operations, and not mere possibilities, McDonald v. Thompson, 1938, 305 U.S. 263, 266, 59 S.Ct. 176, 83 L.Ed. 164, cited in United States v. Carolina Freight Carriers Corporation, 1942, 315 U.S. 475, 480, 62 S.Ct. 722, 86 L.Ed. 971.

Some doubt arises, however, as to the propriety of the action of the commission under this head so far as it concerns one item, namely, the transportation of new airplanes. Clearly it was intended in this case (42 M.C.C. 802) that plaintiff·should have the right to transport new airplanes from points in Nassau County to points within the New York Commercial Zone and also to return damaged or rejected shipments. Apparently, through inadvertence, this provision was not carried into the order as finally entered, an omission which plaintiff failed to call to the attention of the commission. Counsel for the commission on the argument at first seemed to take the position that plaintiff's rights had been lost through inaction, a contention which we should be very reluctant to accept under the circumstances here. But later counsel put forward what we believe to be the true explanation: that new airplanes were intended to be included in the general commodities which plaintiff is entitled to transport. We do not know whether the territorial limitation which the commission made applicable to general commodities would interfere with this operation, which Division 5 in its report found that the plaintiff had conducted, and which the commission noted in its report. But in its brief the commission says before us that the 40-mile radius, under its practice and interpretation, embraces all of Nassau County, Long Island, and, if that is so, plaintiff, under the general commodities section of the order, has not been deprived of its right to transport new airplanes.

V. ■ We come next to another point raised by plaintiff which we do not think requires extended discussion, namely, the transportation of malt beverages. Plaintiff complains that Sullivan and Rockland Counties were omitted from the permitted area of operations. But Rockland County is within the 40-mile radius applicable to general commodities and malt beverages are certainly not excepted. With respect to the omission of Sullivan County, New Haven and Hartford, Connecticut, and other areas, concerning which plaintiff complains, the action of the commission was based upon its reading of the evidence and its conclusion that there was no proof of actual shipments to these areas prior to the grandfather date. The commission chose to give greater weight to the documentary evidence than it did to oral evidence, sometimes vague, which was not reflected in or ·borne out by these documents, and we do not think the commission's findings should be disturbed.

VI. We come now to what we consider the major issues in the cause. Of course, whenever, because the grandfather clause does not apply, the transportation of specific commodities is denied to the plaintiff, or whenever there has been what plaintiff considers undue restriction on the geographical area of its operation, there is still open to plaintiff the remedy of application for a supplementary permit which the commission may grant if it finds justification therefor, Interstate Commerce Act, part II, sec. 209(b), 49 U.S.C.A. § 309(b). But in two respects at least the commission has

put limitations upon the operations of plaintiff which bear all the earmarks of finality: (1) it has said that even with respect to its so-called contracts without responsibility, plaintiff is a "contract carrier", and (2) it has placed upon plaintiff certain definite limitations in the execution of its contracts (other than those dealing with specific commodities, like car signs, malt beverages, etc.). The limitations just referred to are as follows: in the execution generally of its contracts, plaintiff's vehicles must be (1) accompanied by drivers "employed by applicant and who operate such vehicles", and (2) assigned to shippers "under continuing contracts", and, also (3) for the "exclusive use" of the shippers.

VII. ■ Plaintiff says that the commission is in error in holding that its operations (in carrying without responsibility) come within the description of contract carriage. It urges that it is not a carrier at all, so far as its contracts without responsibility are concerned, because it is not a bailee of the goods but merely a lessor of the vehicle. It prefers to call its clients not shippers but lessees. The commission, on the other hand, found that even when plaintiff turned the driver and truck over to a "lessee" who then used that vehicle for its own purposes prescribing routes, there still remained a "presumption" of control by the plaintiff which brought it within the category of a contract carrier under the act.

We are confident that the commission was right in its determination. Whether the legal relationship between the plaintiff and its shippers could be brought within the confines of a common-law bailment is not the important question. The real issue to be decided is whether under this particular statute the commission was right in holding, even with respect to contracts without responsibility, that plaintiff is a "per-son which, under individual contracts or agreements, engages in the transportation * * * by motor vehicle of passengers or property in interstate or foreign commerce for compensation." Interstate Commerce Act, part II, sec. 203(a) (15). We emphasize that we are not speaking of cases where plaintiff merely furnishes the equipment, and the drivers are supplied by the shippers: the commission clearly decided that plaintiff was not a common carrier where such operations are concerned (46 M.C.C. 166). We are speaking of a case where the plaintiff furnishes not only the vehicle but the driver, is compensated, on a mileage or time basis, pays the hire and other incidental expense of the driver, agrees to maintain the leased equipment in good order and repair, to carry insurance, and to garage and fuel the trucks, but does not specifically undertake to transport cargo or to be responsible for loss or damage.

Plaintiff's argument seems to center around the question whether, when it exempts itself from liability to the shipper, it ceases to be engaged in transportation as a matter of law. True, the proof is by no means clear that plaintiff conducted such operations on a wide scale prior to the grandfather clause.[2] But assuming that it did, it cannot be fairly said that responsibility to the shipper is the sole test. Plaintiff itself cites Thomson v. United States, 1944, 321 U.S. 19, 64 S.Ct. 392, 393, 88 L.Ed. 513, as conclusive on the point that "direct and complete control" of the movement and handling of the freight is the test that should be applied. In the case at bar the commission has found that the "presumption" of control by the plaintiff was not overcome by any of the evidence before it.

We see no inconsistency in a finding that plaintiff, even though without responsibility to the shipper, is still so far in control of the movement that it is engaged in trans-

---

[2] The commission mentions specifically only one "contract without responsibility" in force at the grandfather date (the D. Emil Klein contract: 46 M.C.C. 166, petition p. 57). The report of Division 5 might give the impression that there were more. But we think this would be a mistaken impression particularly in the light of the testimony of plaintiff Vice President Hoffman. We doubt that the Liebmann contract and the Wells Fargo contract in fact come within the category mentioned, and if the Klein contract is within that classification, it is by virtue of an amendment made after the grandfather date.

portation under the act. Plaintiff's position in the case at bar is far more closely analogous to that of the plaintiff in the Thomson case than it is to that of the operators whom Thomson hired. It should not be necessary to analyze the legal obligations of plaintiff to determine the question whether it comes within the purview of the statute. The commission properly refused to base its determination upon a single specific phase of the contractual relationship between plaintiff and its clients,[3] and upon all of the facts we agree with that conclusion.[4]

VIII. We come now to the three limitations which the commission placed upon plaintiff's carriage of general commodities, namely, (1) that the carrying vehicles must be accompanied by drivers "employed by applicant and who operate such vehicles", and (2) that they must be assigned to shippers "under continuing contracts", and (3) that they must be for the "exclusive use" of the shippers.

As the transcript of the testimony shows, plaintiff, certainly at the time of the hearings and probably during all of the period before and after the grandfather date had a small amount of telephone call business. Thus it has a salesman who specializes in the solicitation of such business. This type of carriage amounts to about 3 or 4% of plaintiff's business. However, plaintiff's practice is not and was not to solicit any "less than truckload" miscellaneous business for distribution outside of the exempt area, unless that business moved or originated in truckload lots at the point of pick-up. It would, however, solicit truckload lots to any point within an area of 40 or 50 miles of New York City. From all this it clearly appears that the "miscellaneous" business which has been and is being carried on by plaintiff surely amounts to a very tiny and insignificant fraction of its operations, so far as the regulatory power of the commission is concerned. By this we mean that it is not correct to assume that on the grandfather date or since, the miscellaneous business of plaintiff amounted to as much as 5% of the total: so far as the action of the commission is concerned, it is necessary to consider that the proportion of this percentage, which would be carried on beyond the exempt area, is negligible, if indeed there is anything in the record to sustain the contention that there was any at all.

Against such a background, plaintiff's argument, that the limitations on its transportation of general commodities just mentioned would deprive it of its miscellaneous business, can be given very little weight.

Plaintiff seems not to quarrel with the proposition that its "house" contracts (contracts with responsibility, contracts without responsibility, and tonnage contracts) are properly subject to the restrictions we have mentioned. Indeed on this record it is almost impossible to conceive of a shipper's entering into any one of these three types of contract with plaintiff unless that contract provides for (1) vehicles to be operated by employees of the plaintiff, (2) assigned to a particular ship-

---

[3] Even in the field of common law liability on the part of motor vehicle owners to third parties, where control of the vehicle is in some sense of the word divided, the courts have rejected the idea that any particular incident of the legal relationship determines who is the employer of the driver. Irwin v. Klein, 1936, 271 N.Y. 477, 3 N.E.2d 601; Rumberger v. Welch, 2 Cir., 1942, 131 F.2d 384.

[4] Plaintiff, for example, argues that control of the movement is largely in the hands of the shipper, because it selects the routes. But this, it seems to us, is not true of the procedure followed under the contract with the American Tobacco Co. nor under the contract with Liggett & Myers. These, we emphasize, are con-

tracts with responsibility concerning which plaintiff does not challenge the finding of the commission, at least quite as vigorously as it does in the case of contracts without responsibility. There are cases (e. g., the contract with Fritzche Bros.), where an employee of the shipper selects the routes. On the other hand there are instances (e. g., the Colgate-Palmolive-Peet Co. contract) where plaintiff actually maintains an office on the shipper's premises and pays for it. The point we make is that if plaintiff's handling of general commodities is viewed on the facts as a whole, then it is clearly engaged in transportation and this is true in the case not only of contracts with responsibility and tonnage contracts, but also of contracts without responsibility.

per, and (3) for his exclusive use. But after describing its miscellaneous business as a system of pick-ups made as a result of telephone calls and sometimes in small lots, plaintiff urges that the imposition of these limitations by the commission destroys that negligible fraction of its business in violation of its rights under the grandfather clause. The record makes it clear to us that plaintiff's miscellaneous business involved scarcely an instance where its vehicles were assigned to more than one shipper.[5] But plaintiff says the first limitation imposed upon it by the commission, namely, that vehicles assigned to shippers must be driven by "employees" of plaintiff, will prevent it from supplementing its own equipment by renting from some other trucking concern vehicles driven by employees of the latter. There is nothing in the record to indicate that plaintiff often did this. But if there were such evidence, we believe that plaintiff could hire such vehicles and still remain within the order complained of, because undoubtedly the driver of the hired vehicle would be the "employee" of plaintiff, *ad hoc* at least, under its method of operation.

▮ The commission's action is not difficult to understand. It had classified plaintiff as a contract carrier. In line with the declared purposes of the statute,[6] it evidently wished to prevent any encroachment by the plaintiff on the field of common carriage, at least in interstate commerce, and beyond any exempt area. Since a contract carrier, unlike a common carrier, may choose its customers and, within limits, the form and character of its obligation, it should not, while enjoying those privileges, be allowed at the same time to compete in the field of common carriage. To have allowed plaintiff to do what it apparently desired would have been to sanction what the declaration of policy, quoted in the margin, called "unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices".

▮ If plaintiff had shown that any substantial proportion of its "miscellaneous" business was carried on beyond the exempt area at the grandfather date in interstate commerce subject to regulation by the commission, we should be dealing with an entirely different situation. But, by the same token, the commission's order in such a case would undoubtedly have been very different from the one now before us. It is sufficient now to say that the order here under review, so far as plaintiff's miscellaneous business is concerned, leaves plaintiff substantially where it was prior to the grandfather date.

---

[5] If the record had disclosed a practice of this sort carried out on a wide scale, which it does not, it would be hard to justify the finding of the commission that plaintiff was a contract, not a common carrier.

[6] By the Act of September 18, 1940, c. 722, Title I, sec. 1, 51 Stat. 899, 49 U.S.C.A. note preceding section 301, Congress, speaking of the Interstate Commerce Act, said: "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy."

Even though the above policy was expressed as an amendment in 1940, the declaration of purpose affords a demonstration of the legislative intent throughout the period of Congressional control of motor trucking, and other forms of transportation under the statute as originally enacted.

Our examination of the record and consideration of the argument, written and oral, convinces us that the order complained of was provident and should be sustained.

The clerk is directed to enter judgment for the defendants on the merits, with costs, immediately upon receipt of this opinion and direction.